IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

GLENN MINNEY,
12588 WESTFALL ROAD
FRANKFORT, OHIO 45628

      Plaintiff,

v.

UNITED STATES OFFICE OF PERSONNEL
MANAGEMENT
1900 E STREET, NW
WASHINGTON, DC 20415-1000

      Defendant.

Civil Action No. _____

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiff Glenn Minney, by and through his undersigned counsel, respectfully submits this Complaint against the United States Office of Personnel Management ("OPM"). In support thereof, Mr. Minney avers and alleges:

### SUMMARY OF THE ACTION

1. This case concerns a wounded Navy war veteran, Glenn Minney, who was blinded while serving as a medic during a mortar attack on the Haditha Dam in Iraq. The causes of action arise from the failure of a United States government agency to make reasonable accommodations for Mr. Minney's disability in connection with his work as a government employee following his return from Iraq.

2. More specifically, Plaintiff Glenn Minney brings this action against Defendant OPM for failing to provide him notice of an earnings limitation on his disability benefits in a

manner accessible to a blind individual. This failure by the Defendant was discriminatory under Section 504 of the Rehabilitation Act and the ultimate denial of Plaintiff's disability benefits without proper notification to Plaintiff violated Mr. Minney's Fifth Amendment rights to procedural due process. As a result, Mr. Minney faces the loss of vital health insurance and benefits on which he and his daughters rely.

3. Mr. Minney has dedicated his life to the service of his country. He has served 21 years in the United States Navy. While on reserve duty, he worked in the Department of Veterans' Affairs ("VA") as a firefighter and paramedic. A little more than nine years ago, while serving in Iraq as a medic providing medical care to Marines in the midst of battle, Mr. Minney lost his vision when he was hit by a mortar blast.

4. Although after being blinded Mr. Minney could no longer serve in the field as a medic, Mr. Minney did not give up his desire to serve his country and other veterans. Thus, he returned to work at the VA to serve as a patient advocate.

5. But Mr. Minney was faced with constant difficulties at the VA as a result of his disability. The VA failed to accommodate Mr. Minney's loss of vision, and Mr. Minney was unable to use the VA computer systems—a requirement for his job—because they were incompatible with his screen-reading software. Reluctantly, Mr. Minney agreed to retire from the VA because he could not use the computers, and Mr. Minney began receiving Federal Employees Retirement System ("FERS") disability benefits, which included medical benefits for him and his two daughters.

6. Subsequently, Mr. Minney went to work for the Blinded Veterans Association (the "BVA"), an organization advocating for veterans who were blinded in service to their country. However, early this year, Mr. Minney received a letter from OPM requesting

information regarding Mr. Minney's 2014 salary at the BVA. The letter stated that Mr. Minney's FERS benefits would terminate if his salary exceeded 80 percent of the current rate of pay for the position from which Mr. Minney had retired at the VA (the "80 Percent Limitation"). Mr. Minney's salary at the BVA exceeded the 80 Percent Limitation. Prior to February 2015, Mr. Minney had never been informed of this limitation. OPM claims that Mr. Minney was notified of the limitation in two ways: (1) through a letter OPM sent to the wrong address, that Mr. Minney did not receive, and that was in a format Mr. Minney could not read because he is blind; and (2) through OPM's website, but Mr. Minney cannot view that website because he is blind and the website is not compatible with screen-reading software. Mr. Minney and his two daughters rely on his FERS disability benefits, specifically his health insurance.

7. After learning of the earnings limitation, Mr. Minney resigned from his position at the BVA, so that going forward he would be compliant with the earnings limitation. Nevertheless, on May 7, 2015, Defendant notified Mr. Minney that his FERS benefits will be terminated effective June 30, 2015. Thereafter, Mr. Minney filed a Request for Reconsideration of the agency's decision, a request that is still pending. Because Mr. Minney has been advised that his benefits may be terminated while his Request is pending and that, in any event, the Request will be denied, Mr. Minney is in imminent danger of losing the FERS benefits on which he and his children rely.

8. Accordingly, Mr. Minney seeks declaratory and injunctive relief, enjoining Defendant OPM from terminating his FERS benefits.

**PARTIES**

9. Plaintiff Glenn Minney is a United States Navy Veteran, who served 21 years in the United States Navy on both active and reserve duty. Mr. Minney served as a Navy combat corpsman, accompanying Marine units into combat to provide emergency medical services as a

medic to injured Marines in Operation Just Cause in Panama, Operation Desert Storm and Desert Shield in the Persian Gulf, and most recently Operation Iraqi Freedom. Mr. Minney was blinded on April 18, 2005 after he was hit by mortar fire at Haditha Dam in Iraq. Mr. Minney is a former employee of the VA in Chillocothe, Ohio. In 2010, Mr. Minney retired from the VA because of his disability. From January 4, 2014 to July 3, 2015, Mr. Minney was a resident of Alexandria, Virginia and was employed in Alexandria, Virginia at the BVA. He is currently a resident of Frankfort, Ohio.

10. Defendant the United States Office of Personnel Management ("OPM") is an independent agency of the United States government that manages the civil service of the federal government. Among other things, OPM is responsible for managing pension and disability benefits for retired federal employees and administering health and other insurance programs for federal employees and their families. OPM's offices are located at 1900 E Street, NW, Washington, D.C. 20415.

## JURISDICTION AND VENUE

11. The Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1346.

12. The Court further has jurisdiction pursuant to Section 504 of the Rehabilitation Act, codified as 29 U.S.C. § 794, because Plaintiff has exhausted his administrative remedies by filing all available appeals. Plaintiff has appealed Defendant's termination of his benefits (which action is the subject of this lawsuit). Although this appeal is pending, Plaintiff has been informed that his benefits may be terminated at any time during the pendency of the appeal. Further Plaintiff has been advised by the agency that his appeal will be denied.

13.   Venue is proper in this District pursuant to 28 U.S.C.§ 1339(b)(1) and (2) because Defendant is located in this District and this action is based on events that took place in this District.

## FACTUAL BACKGROUND

*Mr. Minney's Military Service and Employment at the VA*

14.   Mr. Minney enlisted in the United States Navy on September 4, 1985. For 21 years, Mr. Minney served on both active and reserve duty as a Navy corpsman accompanying Marine units into combat to provide emergency medical services to injured Marines. Mr. Minney served his country in Operation Just Cause in Panama, Operation Desert Storm and Desert Shield in the Persian Gulf and most recently Operation Iraqi Freedom.

15.   Affectionately referred to as "Doc" by the Marines under his care, Mr. Minney received numerous military awards and honors during his service: Purple Heart, Navy Commendation with "V", Combat Action, Sea Service Ribbon, Overseas Service Ribbon, Navy Unit Commendation, Marine Unit Commendation, Presidential Unit Commendation, FMF Ribbon, Iraqi Campaign, GWOT, Kuwait Liberation, Good Conduct, Expert Pistol and Rifle, and Fleet Marine Force Warfare Breast insignia.

16.   Mr. Minney originally served on active duty in the U.S. Navy from September 4, 1985 to June 1987. He then served as a reservist until he was again called to active duty in 1990 to serve, for nine months, in Operation Desert Storm and Desert Shield.

17.   In 1991, upon returning from active service, Mr. Minney took a position as a pharmacy tech at the VA Medical Center in Chillocothe, Ohio. From 1997 to 2005, he served as a firefighter and paramedic with the fire department at the VA at Chillicothe.

18. On January 3, 2005, Mr. Minney was called to active duty to serve in Operation Iraqi Freedom. He served as a combat corpsman (i.e., a combat medic) with a specialty in pharmacy.

*Mr. Minney Is Blinded While Serving in Iraq*

19. On April 18, 2005, 28 days before Mr. Minney's planned retirement from the U.S. Navy, he was assigned to accompany Marine ground troops protecting the Haditha Dam in Iraq. During the operation, insurgents launched a mortar strike on the dam. Mr. Minney was hit by mortar fire while on the tenth floor of the dam retrieving medical supplies for injured Marines. The mortar explosion caused severe, irreparable injuries to Mr. Minney's eyes and traumatic brain injury.

20. After the explosion, Mr. Minney was transported to Germany where he underwent five eye surgeries. He spent approximately one-and-a-half years in various hospitals recovering from his injuries.

21. The injuries left Mr. Minney totally blind in his right eye and with severely limited vision in his left eye due to lattice and macular degeneration. The impact of the explosion caused Mr. Minney severe Traumatic Brain Injury with a loss of 25 percent of his occipital and parietal lobes.

22. In October 2006, Mr. Minney was discharged from Camp LeJeune Medical Center and retired from the Navy.

*Mr. Minney Continues to Serve His Country at the Department of Veteran's Affairs*

23. After retiring from the Navy, Mr. Minney wanted to continue to serve his country and the men and women that risk their lives for it, so he returned to the VA in Chillicothe, Ohio, where he served in an administrative position in the Patient Advocates Office in the Office of the Director.

24. Around the time Mr. Minney returned to working at the VA in 2006, the VA was implementing a computer software system called the Patient Advocate Tracking System ("PATS"). Mr. Minney's job responsibilities included inputting information into PATS.

25. Because he is blind, Mr. Minney was unable to use the computer to access the PATS without special software. Thus, he spoke to the VA Equal Employment Opportunity ("EEO") personnel about making accommodations to the computer that would have permitted him to perform his work. But the screen-reading software designed to enable blind individuals to work on computers—which would have enabled Mr. Minney to perform his job responsibilities—was not (and is not) compatible with PATS.

26. After Mr. Minney advised his EEO representative that the reading software did not accommodate his disability, the representative took steps to acquire a closed circuit television system ("CCTV") that would magnify images so that he could read them. However, it took many months for the CCTV to arrive, and Mr. Minney was not able to begin using it until the middle of 2007.

27. Even with the CCTV, Mr. Minney could not effectively work with PATS. It took Mr. Minney between one and two hours to fill out a form that would have taken a person with vision mere minutes to complete. After the form was filled out, someone else would have to input the form into PATS.

28. In addition to PATS, the VA used other computer systems that were not compatible with the screen-reading software necessary to accommodate a blind person's disability. Mr. Minney was expected to use the computerized patient record system ("CPRS"), a system for patient electronic medical records, and a system called "Vista" to log in to the

computer each day and make certain administrative requests. Neither system was compatible with any provided accommodation.

29. Despite Mr. Minney's repeated conversations with his EEO representative, the VA was unable to offer Mr. Minney an accommodation that would allow him to access the computer systems required for his position at the Patient Advocates Office. In 2008, the VA transferred Mr. Minney to a new position where the VA believed Mr. Minney would not be required to use a computer. In his role as program specialist, patient advocate and peer support specialist, Mr. Minney advocated for veterans' rights and helped them secure the medical care and educational benefits they earned as a result of their service.

30. Unfortunately, in this new position, Mr. Minney was still expected to file complaints into the PATS and make patient notes in the CPRS. Despite repeated requests and inquiries, the VA EEO did not make an accommodation that would allow Mr. Minney to perform those job responsibilities that required access to the PATS, the CPRS and the Vista system.

31. In 2010, the VA told Mr. Minney that he could accept a position as a "door greeter" at the VA: a position that would not require the use of computers but would entail a significant demotion and salary decrease, and a role Mr. Minney did not think he could properly perform because he would not be able to see or recognize individuals coming into the VA facility. Alternatively, the VA said that Mr. Minney could retire with FERS disability benefits.

*Mr. Minney is Forced to Retire from the VA and Finds New Purpose Working for the BVA*

32. On September 30, 2010, Mr. Minney retired from the VA. Upon his retirement, Mr. Minney had an exit interview with human resources ("HR") staff at the VA. Mr. Minney asked his HR representatives whether he were limited in any way in accepting future employment. The HR staff told Mr. Minney that the only limitation on his future employment

was that he could not accept a position working for the federal government without losing his FERS disability benefits.

33. Mr. Minney had no contact with OPM upon his retirement, and Mr. Minney at all times viewed the HR staff at the VA as his contacts with respect to his disability retirement benefits. This is not unusual, as OPM encourages federal employees to interface primarily, if not exclusively, with the HR staff at their respective agencies. *See* OPM Website, https://www.opm.gov/retirement-services/benefits-officers/ ("Human Resources (HR) Administrators in the various Federal agencies are often generalists whose duties include and administration of retirement programs and related employee benefits programs.")

34. On April 22, 2011, Mr. Minney began receiving his FERS disability benefits. His benefits include health insurance through Blue Cross Blue Shield and approximately $1,200 on the first day of every month, which is his net benefit after deductions for medical coverage. Both of Mr. Minney's daughters are also covered under Mr. Minney's health insurance plan.

35. Mr. Minney viewed his retirement from the VA as a forced retirement. He wanted to continue to contribute to the workforce and serve the Veterans at the VA, but the VA did not make continued work possible because of their inability or unwillingness to make accommodations for Mr. Minney's visual impairment. In 2014, however, Mr. Minney found a new opportunity to serve and advocate for Veterans. On January 6, 2014, Mr. Minney accepted a position in Alexandria, Virginia working for the BVA on behalf of veterans who were blinded in military service.

36. In addition to his two daughters, Mr. Minney also supports his ailing father. Mr. Minney believed that he would only be able to financially afford to accept the position at the BVA in the Washington, D.C. metropolitan area—where the cost of living was much higher than

where Mr. Minney lived in Ohio—if he were receiving his pay through the BVA as well as his FERS disability benefits. Mr. Minney believed that by accepting this position, he remained in full compliance with the FERS disability benefits program. BVA was not a branch or agency of the federal government—the only limitation on Mr. Minney's employment that had ever been communicated to him.

37. During his work at the BVA, Mr. Minney found new purpose and a rewarding and challenging career advocating for Veterans. Through the BVA, Mr. Minney met other blind, former health care professionals who, just like him, had been forced to retire from the VA because the computer systems were not compliant with screen-reading software. The inability for blind Veterans to access computer programs and websites became a cornerstone of Mr. Minney's advocacy at the BVA. Mr. Minney worked passionately to urge government agencies, specifically the VA, to update their websites to become compliant with Section 508 of the Rehabilitation Act.

***OPM Contacts Mr. Minney for the First Time and Denies Mr. Minney's Benefits Without Notice***

38. In February 2015, just over a year after beginning his work at the BVA, Mr. Minney received a letter from OPM at his home in Virginia—his first ever communication from OPM. The letter was not in a format accessible to Mr. Minney. It was not written in braille or any other format that would have allowed Mr. Minney to read the letter. Mr. Minney had to have someone else read the letter to him.

39. The February 2015 OPM letter requested that Mr. Minney fill out a form detailing any income he had received in 2014. In the letter, OPM stated that Mr. Minney was not permitted to continue to receive FERS disability benefits if he earns income that exceeds 80 percent of the current rate of pay for the position from which he had retired. This was the first

Mr. Minney had ever heard of the 80 Percent Limitation, and it directly contradicted what he had learned from HR representatives at the VA.

40. Mr. Minney's salary at the BVA exceeded the 80 Percent Limitation. Had Mr. Minney been aware of the 80 Percent Limitation, he would have been able to make an informed decision about his future employment.

41. On March 2, 2015, Mr. Minney returned the form detailing his 2014 income to OPM.

42. On May 8, 2015, OPM sent Mr. Minney another letter, again not in a format that he could read, stating that Mr. Minney had exceeded the 80 Percent Limitation and that his FERS disability benefits, including his health insurance, would be terminated on June 30, 2015. The letter also stated that he could not reapply for FERS disability benefits until January 1, 2016.

43. On May 27, 2015, with the help of counsel representing Mr. Minney *pro bono*, Mr. Minney applied to OPM with a Request for Reconsideration of the termination of his benefits. Mr. Minney and counsel also contacted OPM personnel by telephone to try and resolve the issue. Mr. Minney's congressman, Congressman Steve Stivers of Ohio, also contacted OPM personnel to help prevent the termination of Mr. Minney's benefits.

44. Congressman Steve Stivers's office staff were told by OPM personnel that Mr. Minney had been notified of the 80 Percent Limitation by letter on April 22, 2011. OPM personnel provided a copy of that notification to Congressman Stivers's staff. Importantly, Mr. Minney never received the April 22, 2011 letter; it was sent to an incorrect address—an address Mr. Minney had not used since 2006. Further, the letter was again not provided in an accessible format for Mr. Minney to read. As described earlier, Mr. Minney always viewed HR staff at the VA as his contacts with respect to his retirement benefits, an arrangement encouraged by OPM,

and he had always kept HR staff at the VA informed of his address. Indeed from 2006 to 2010 he was employed by the VA and he regularly received mail to the correct address.

45. In communications with Congressman Stivers's staff, Associate Director of Retirement Services at OPM, Kenneth Zawodny, argued that OPM had not accommodated Mr. Minney with a letter in a format he could read because Mr. Minney had never made a specific request for such an accommodation. The argument was Kafkaesque: Mr. Minney was only receiving FERS disability benefits because the VA could not accommodate his blindness. Further, HR staff at the VA, Mr. Minney's only contacts for OPM benefits, were well aware of Mr. Minney's needs for accommodation in this regard, and until this time, HR staff were Mr. Minney's only contacts regarding his OPM benefits.

46. In addition, OPM repeatedly stated to Mr. Minney and to the Office of Congressman Stiver that Mr. Minney should have been on notice of the 80 Percent Limitation because it was detailed on OPM's website. However, the OPM website and the 80 Percent Limitation notification thereon is not compatible with screen-reading software and is thus inaccessible to Mr. Minney. This is ironic, as federal agency website compliance with screen-reading software has been the very focus of Mr. Minney's advocacy at the BVA.

47. As of July 2, 2015, Mr. Minney and his counsel have been informed by OPM staff that even though Mr. Minney's benefits remain "active," his benefits may be terminated at any time, even prior to a final determination of his Request for Reconsideration.

48. Mr. Minney has not yet received final determination of his Request for Reconsideration; however, when Mr. Minney spoke with Mr. Zawodny of OPM, Mr. Zawodny informed Mr. Minney that if he filed a Request for Reconsideration, it would be reviewed by Mr. Zawodny and that Mr. Zawodny intended to deny the request.

49.  On July 3, 2015, Mr. Minney ended his employment at BVA. Accordingly, his salary is now within the 80 Percent Limitation to maintain his FERS benefits. OPM has informed Mr. Minney that he may reapply for FERS benefits in January 1, 2016, but not before that date.

## COUNT I
### Section 504 of the Rehabilitation Act of 1973

50.  Plaintiff repeats and re-alleges each and every allegation above as if fully set forth herein.

51.  Section 504 states "No otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination . . . under any program or activity conducted by any Executive agency . . . ." 29 U.S.C. § 749(a).

52.  Plaintiff is substantially limited in the major life activity of seeing; as such, he is an individual with a disability under 29 U.S.C. § 705(20(B) who is qualified under Section 504.

53.  OPM is a "program or activity conducted by [an] Executive agency" under Section 504 of the Rehabilitation Act. 29 U.S.C. § 749(a).

54.  At all times relevant to this action, Section 504 was in full force and effect in the United States, and Mr. Minney had a right not to be subjected to discrimination on the basis of his disability by Defendant.

55.  Defendant failed to provide Mr. Minney with any notice of the 80 Percent Limitation. The notice allegedly provided to Mr. Minney was not received by Mr. Minney as it was sent to an incorrect address—an error for which Defendant can provide no justifiable excuse. Such notice was further made in a discriminatory manner because it was made in the form of a letter which Mr. Minney could not read. The alleged notification made through

Defendant's website was insufficient and discriminatory in that it is not compatible with screen-reading software and thus non-compliant with Section 504 or 508 of the Rehabilitation Act.[1]

56. Defendant's failure to notify Mr. Minney of the 80 Percent Limitation in a manner in which he could access the information had a disparate impact on Mr. Minney because of his disability, resulting in Mr. Minney being denied the same benefits and services available to non-blind FERS recipients.

57. As a result of Defendant's failures, Mr. Minney's FERS benefits are due to be terminated in the near future—indeed, they could be terminated any day now—depriving Mr. Minney of much needed health insurance and vital income.

58. Defendant's failures have violated Mr. Minney's rights under Section 504.

59. Upon information and belief, the failure to provide effective communication to blind individuals, such as Mr. Minney, specifically proper notification of the 80 Percent Limitation, and the failure to provide comparable access to benefits as provided to non-blind individuals are policies, regular practices, or customs of the Defendants. This failure is ongoing and continues to date.

60. As a result of the Defendant's violation of Section 504, Mr. Minney has suffered discrimination and has been denied benefits under FERS.

---

[1] Section 508 of the Rehabilitation Act provides that "[w]hen developing, procuring, maintaining, or using electronic and information technology, each Federal department or agency. . . shall ensure . . . that the electronic and information technology allows . . . individuals with disabilities who are members of the public seeking information or services from a Federal department or agency to have access to and use of information and data that is comparable to the access to and use of the information and data by such members of the public who are not individuals with disabilities."

## COUNT II

### (Violation of Procedural Due Process)

61. Plaintiff repeats and re-alleges each and every allegation above as if fully set forth herein.

62. The Due Process Clause of the Fifth Amendment to the United States Constitution prohibits Defendant from depriving any person of life, liberty or property without due process of law.

63. Plaintiff Mr. Minney has a property interest in his FERS benefits. Mr. Minney's FERS benefits are of great value to him, as they provide healthcare for him and his two daughters, in addition to financial support.

64. Defendant OPM has an interest in the proper administration of FERS disability benefits.

65. Defendant has a policy in place to notify FERS beneficiaries of their benefits and any limitations thereon. Defendant failed to follow this policy and notify Mr. Minney of the 80 Percent Limitation.

66. Defendant's denial of Mr. Minney's FERS benefits is without due process of law because the denial is without any notice, neither in accessible form or otherwise, of the 80 Percent Limitation to Mr. Minney.

67. The cost of notifying Mr. Minney at his correct address and in a format accessible to Mr. Minney is minimal, and is statutorily required under the Rehabilitation Act.

68. Further, while Defendant provides for a reconsideration process, Mr. Zawodny, an agent of Defendant, has indicated that the reconsideration process is futile and that Mr. Minney's appeal will be denied.

69. As a result, the application of the 80 Percent Limitation, with no notice to Mr. Minney and without meaningful appeal violates the Due Process Clause of the Fifth Amendment.

70. Therefore, Plaintiff is entitled to declaratory and injunctive relief.

## RELIEF REQUESTED

**WHEREFORE**, Plaintiff Glenn Minney respectfully requests this Court to enter judgment in his favor and against OPM as follows:

(a) declaring that Mr. Minney's rights have been violated pursuant to Section 504 of the Rehabilitation Act and the Due Process Clause of the Fifth Amendment to the United States Constitution;

(b) granting preliminary and permanent injunctive relief enjoining Defendant OPM from terminating Mr. Minney's FERS benefits, including his health insurance;

(c) granting Plaintiff such other relief as is just and appropriate.

Dated: July 13, 2015
       Washington, D.C.

Respectfully Submitted,

AKIN GUMP STRAUSS HAUER & FELD LLP

_____
Larry E. Tanenbaum (927301)
Joseph W. Whitehead (*bar application pending*)
Jennifer L. Woodson (*pro hac vice motion pending*)
1333 New Hampshire Avenue, NW
Washington, D.C. 20036
Tel: (202) 887–4000
Fax: (202) 887-4288
ltanenbaum@akingump.com

*Counsel to Plaintiff Glenn Minney*