# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| GLENN MINNEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **Civil Case No.** |
| | ) | **1:15-cv-1092 (RJL)** |
| UNITED STATES OFFICE OF | ) | |
| PERSONNEL MANAGEMENT, | ) | **FILED** |
| | ) | |
| Defendant. | ) | **SEP 1 5 2015** |
| | ) | |

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

## MEMORANDUM OPINION

(September **15**, 2015) [Dkts. #2, #14, #23]

This is a tragic case of a severely wounded and much decorated war veteran seeking reinstatement of disability benefits that the federal bureaucracy at the Office of Personnel Management extinguished on a technicality. Plaintiff Glenn Minney ("plaintiff" or "Minney") commenced the instant action against defendant United States Office of Personnel Management ("defendant" or "OPM"), on July 13, 2015, seeking a preliminary injunction to remedy alleged violations of section 504 of the Rehabilitation Act of 1973 and the due process clause of the Fifth Amendment. *See generally* Compl.; Pl. Glenn Minney's Mot. for TRO & Prelim. Inj. ("Pl.'s Mot.") [Dkt. #2]; Mem. of Law in Supp. of Pl. Glenn Minney's Mot. for TRO & Prelim. Inj. ("Pl.'s Mem.") [Dkt. #2-1]. OPM not only opposes the entry of a preliminary injunction, but also moves to dismiss for lack of jurisdiction. *See* Def.'s Mot. to Dismiss for Lack of Jurisdiction and Opp'n to Pl.'s Mot. for Prelim. Inj. ("Def.'s Mot.") [Dkt. #14]. Upon careful review of the

1

pleadings, the relevant law, and the entire record herein, the Court DENIES OPM's

Motion to Dismiss, GRANTS plaintiff's Motion for a Preliminary Injunction, and

REINSTATES plaintiff's Federal Employee Retirement System Benefits.[1]

## BACKGROUND

Plaintiff joined the Navy in 1985, where he served as a corpsman on both active

and reservist duty for over twenty years. Decl. of Glenn Minney in Supp. of Mot. for

TRO & Prelim. Inj. ("Minney Decl.") ¶¶ 2, 4 [Dkt. #2-2]. Plaintiff, having earned a

Purple Heart Medal and numerous other military honors and awards during his decades-

long service, had a distinguished naval career. *See* Minney Decl. ¶ 3.

The instant case arises from his deployment to Iraq in January 2005. *See* Minney

Decl. ¶ 9. On April 18, 2005, plaintiff accompanied Marine ground troops to the Haditha

Dam, where he was caught in the crosshairs of an insurgent strike and severely injured in

an ensuing mortar explosion. Minney Decl. ¶ 10. His injuries proved devastating. In the

days and months following the attack, plaintiff's vision deteriorated to the point of near-

blindness. Minney Decl. ¶¶ 12-17. Subsequent medical examinations yielded a grim

prognosis. In addition to irreparably damaging plaintiff's optic nerve, the blast destroyed

twenty five percent of the brain tissue in his parietal and occipital lobes, leaving him fully

blind in his right eye, mostly blind in his left eye, and, as a result, permanently disabled.

---

[1] The Court also DENIES plaintiff's Motion to Strike Defendant's Supplemental Memorandum [Dkt. #23].

Minney Decl. ¶¶ 16-17.  Unable to continue active service, plaintiff retired from the Navy

in October 2006.  Minney Decl. ¶ 18.

Later that same month, plaintiff began working for the VA Patient Advocates

Office, where he earned approximately $49,000 per year.  Minney Decl. ¶ 19.  The VA's

inability to accommodate his visual impairments rendered even the most menial tasks

difficult, and the physical demands of his position soon proved untenable.  *See* Minney

Decl. ¶¶ 20-32; Compl. ¶¶ 25-31.  This, of course, did not escape the VA's notice.  In

2010, the VA informed plaintiff that he would not be able to continue in his current

capacity and offered him a choice.  Minney Decl. ¶ 32.  Either he could take a position as

"door greeter," which paid approximately $25,000 a year, or he could retire with Federal

Employees Retirement Systems ("FERS") disability benefits.  Minney Decl. ¶¶ 33-34;

Compl. ¶ 31.  Financially unable to accept the former, plaintiff opted for retirement.

Minney Decl. ¶ 34.

On October 2, 2010, plaintiff applied for FERS benefits.  Decl. of Trevis A. Hall

("First Hall Decl.") ¶ 4 [Dkt. #9-1].  OPM approved plaintiff's application on April 22,

2011 and sent a written notice of his approval to the mailing address it had on file—a

P.O. Box in Clarksburg, Ohio.  *See* Decl. of Kimberly A. Wilhelm ("Wilhelm Decl.") ¶ 5

[Dkt. #21-2].  Included within this April 2011 notice was a paragraph detailing the effect

"Restoration of Earning Capacity" would have on his FERS benefits.  *See* First Hall Decl.

¶ 4.  This notice advised plaintiff that:

3

"[i]f you are under age 60 and working in a non-federal position, there is a limit on the amount you can earn . . . and still be entitled to your annuity payment. If your earnings in any calendar year equal at least 80 percent of the current salary of the position from which you retired, we will find your earning capacity to have been restored. Disability annuity payments will stop six months from the end of the calendar year in which your earning capacity is restored."

Ex. To Def.'s Notice of Filing of Decl. and Exs. & Mem. of Law, [Dkt. #9-2]. Plaintiff claims, however, that he never received this mailing because it was sent to the incorrect address. Minney Decl. ¶ 37. Nor, for that matter, did the VA's Human Resources specialist apprise plaintiff of this earning restriction before he left the VA. Indeed, upon his departure from the VA, plaintiff was advised only that his benefits would terminate if he returned to work for the federal government. *See* Minney Decl. ¶¶ 35-36. According to plaintiff, he did not learn of any earning restrictions whatsoever until approximately four years *after* he obtained FERS approval. *See* Minney Decl. ¶ 35.

Unaware of any limitations on his entry into the private workforce, plaintiff began working as a legislative liaison for the Blinded Veterans Association ("BVA"), where he earned $56,000 per year. Minney Decl. ¶ 39; Compl. ¶ 35. In February 2015, approximately one year after beginning work at the BVA, plaintiff received a print letter from OPM at his home address in Virginia. Compl. ¶ 38. Because the letter "was not written in braille or any other format that would have allowed [him] to read" it, plaintiff "had to have someone else read [it] to him." Compl. ¶ 38. Its contents were, according to plaintiff, shocking. The letter advised plaintiff that his FERS benefits would *terminate* if

4

his 2014 income exceeded 80 percent of the current rate of pay for the position from

which he had retired, the so-called "eighty percent limitation."   Compl. ¶ 39; Minney

Decl. ¶ 37.[2]

Thereafter, at OPM's request, plaintiff reported his 2014 income from the BVA,

which, at $56,000, exceeded his $54,100 income at the VA for the previous fiscal year.

Decl. of Trevis A. Hall ("Second Hall Decl.") ¶ 4 [Dkt. #14-1]; *see* Minney Decl. ¶ 42.

This, too, did not escape OPM's notice.  On May 8, 2015, OPM advised plaintiff that

because his BVA salary exceeded the eighty percent limitation, OPM would terminate his

FERS benefits.  First Hall Decl. ¶ 4; Minney Decl. ¶¶ 43-45.  Plaintiff sought

reconsideration, but was advised by OPM, while his request was still pending, that it

would be denied.  Minney Decl. ¶¶ 51-52.  OPM made good on its promise and

terminated plaintiff's benefits on June 30, 2015.  *See* Second Hall Decl. ¶ 4.  Plaintiff

received his last disability annuity payment on July 1, 2015.  Second Hall Decl. ¶ 4.

Although plaintiff is eligible to reapply for his benefits in January 1, 2016, he, and his

---

[2] There remains substantial disagreement as to whether this was, in fact, the first notice plaintiff received from OPM.  Plaintiff contends that he did not receive this information in April 2011 because it was sent to the incorrect address.  Minney Decl. ¶ 37.  OPM counters that in October 2011, it sent a print—not braille—benefits booklet, reiterating the eighty percent limitation, to plaintiff's correct mailing address in South Salem, Ohio.  *See* Wilhelm Decl. ¶¶ 7-8.  Plaintiff maintains, however, that the first mailing he received, and understood, was in February 2015.  *See* Pl.'s Mem. in Supp. of Pl.'s Mot. to Strike Def.'s Suppl. Mem. at 7 [Dkt. #21-3].

daughters, are currently without the medical coverage FERS previously provided.[3] *See* Second Hall Decl. ¶ 4.

On July 13, 2015, plaintiff filed a complaint alleging that OPM had violated section 504 of the Rehabilitation Act of 1973 and the due process clause of the Fifth Amendment by failing to provide adequate advance notice of the eighty percent limitation. *See generally* Compl. That same day, plaintiff sought a Temporary Restraining Order ("TRO") and Preliminary Injunction to prevent OPM from terminating his FERS benefits. *See* Pl.'s Mot. By Order dated July 21, 2015, this Court denied issuance of a TRO, but reserved judgment as to the propriety of a Preliminary Injunction, the merits of which are presently before the Court. Order [Dkt. #11].

## STANDARD OF REVIEW[4]

A preliminary injunction is an "extraordinary remedy," and, as such, "should be

---

[3] In addition to furnishing a monthly stipend of $1,200 for emergency medical coverage that plaintiff is otherwise without, plaintiff's FERS benefits also defrayed the costs of medical and psychological treatment for his two daughters. Minney Decl. ¶¶ 44, 46-48.

[4] Brief mention must be made of OPM's motion to dismiss for lack of jurisdiction, which the Court finds meritless. OPM makes a strained attempt to channel plaintiff's due process challenge through the Merit Systems Protection Board ("MSPB"), which has the authority to adjudicate FERS-related claims. *See generally* Def.'s Mot. While it is certainly true that the MSPB may consider due process claims in connection with disability benefits appeals, it is by no means the sole or exclusive forum for constitutional challenges that are wholly collateral to the types of disputes the MSPB is authorized to hear. *See Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 212 (1994). Furthermore, sovereign immunity is not, as OPM contends, a bar to this Court's jurisdiction over the instant action. *See* Def.'s Mot. at 10-12. Section 702 of the Administrative Procedure Act, which waives sovereign immunity in *any* action against the federal government for non-monetary relief, forecloses this argument. *See Trudeau v. FTC*, 456 F.3d 178, 186 (D.C. Cir. 2006). Because the type of relief sought here—restoration of benefits—constitutes a claim for injunctive relief, this action falls squarely within the APA's sovereign immunity waiver. *See Tootle v. Sec'y of Navy*, 446 F.3d 167, 175-76 (D.C. Cir. 2006). The Court therefore declines to dismiss this case for lack of jurisdiction and progresses directly to the merits of plaintiff's Motion for a Preliminary Injunction.

granted only when the party seeking the relief, by a clear showing, carries the burden of

persuasion." *Cobell v. Norton*, 391 F.3d 251, 258 (D.C. Cir. 2004) (citation omitted).  To

prevail on a motion for a preliminary injunction, a plaintiff must demonstrate "that he is

likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence

of preliminary relief, that the balance of equities tips in his favor, and that an injunction is

in the public interest." *Winter v. NRDC, Inc.*, 555 U.S. 7, 20 (2008) (citations omitted).

Courts considering these factors do so on a "sliding scale,"[5] whereby a strong showing as

to one factor may compensate for a less persuasive showing as to another factor.  *Davis v.*

*Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1291-92 (D.C. Cir. 2009).[6]  The Court takes

seriously its obligation to reserve injunctive relief for the most extraordinary of situations.

Nonetheless, upon careful consideration, I find that injunctive relief is not only

appropriate, it is *necessary* to remedy the profound injustice committed by the federal

bureaucracy against a blind war veteran.  Indeed, it is difficult to imagine a situation more

extraordinary—or an individual more deserving—of such relief!

---

[5] While it is unclear whether the "sliding scale" is controlling in light of the Supreme Court's decision in *Winter*, the Court need not decide that issue today because it finds that plaintiff has carried the burden of persuasion as to all four factors.

[6] Where, as here, a plaintiff seeks a mandatory injunction, *i.e.* an injunction that would require a positive act on the part of the defendant, certain courts have held that a plaintiff is held to a higher burden of persuasion. *Veitch v. Danzig*, 135 F. Supp. 2d 32, 35 n.2 (D.D.C. 2001) (citations omitted). The D.C. Circuit, however, has yet to address whether plaintiff carries a heightened burden and this Court, as such, declines to impose a heightened standard of persuasion. *See, e.g., Friends for All Children, Inc. v. Lockheed Aircraft Corp.*, 746 F.2d 816, 834 n.31 (D.C. Cir. 1984) ("In this circuit, however, no case seems to squarely require a heightened showing, and we express no view as to whether a heightened showing should in fact be required.").

## DISCUSSION

### I. Likelihood of Success on the Merits

Plaintiff advances two legal theories as a basis for injunctive relief: violation of section 504 of the Rehabilitation Act or, in the alternative, violation of Fifth Amendment due process. *See* Pl.'s Mem. at 8-12. For the reasons discussed herein, the Court finds plaintiff's due process argument persuasive and refrains from addressing the merits of his statutory challenge.

The Fifth Amendment mandates that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. To prevail on a procedural due process claim, plaintiff must establish that he is legally entitled to his FERs benefits, that additional safeguards would have prevented an erroneous deprivation of that entitlement, and that his interests outweigh any incidental burdens on the government from the imposition of additional safeguards. *See Mathews v. Eldridge*, 424 U.S. 319, 335 (1976).

The threshold question, then, is whether plaintiff has a cognizable property right. The answer is clear: he most assuredly does. Property interests "take many forms." *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 576 (1972). OPM is quick to point out that unsubstantiated "desires" and "unilateral expectations" are not "property" in the constitutional sense. *See* Def.'s Suppl. Mem. in Supp. Of Def.'s Mot. to Dismiss for Lack of Jurisdiction and Def.'s Opp'n to Pl.'s Mot . for Prelim. Inj. ("Def.'s Suppl.

8

Mem") at 3 [Dkt. #21].  This is certainly true.  But plaintiff's receipt of FERS benefits is hardly aspirational.  To the contrary, his benefits, which were conferred by operation of statute, are eminently concrete.  It has long been the case that property interests may arise from federal entitlement schemes like the one at issue here.  *See Roth*, 408 U.S. at 576-77; *see also Goldberg v. Kelly*, 397 U.S. 254, 262 (1969) (due process applies "to the withdrawal of public assistance benefits").  It is, moreover, implicit in Supreme Court jurisprudence that federal disability benefits are precisely the type of benefits to which property interests attach.  *See Mathews*, 424 U.S. at 332 (finding that "the interest of an individual in continue receipt of [Social Security disability benefits] is a statutorily created 'property' interest protected by the Fifth Amendment").  As a disability benefit created, funded, and run by the federal government, plaintiff's FERS benefits are analogous to the myriad other entitlement programs that have received due process protection to date.  It is difficult indeed to conceive of a benefit that resides more perfectly within the aegis of constitutional protection.  And yet, OPM seeks to excise FERS from the constitutional fold by alleging that plaintiff's expectation of continued receipt is based on the "alleged oral misrepresentation by the Department of Veterans Affairs."  *See* Defs.' Suppl. Mem. at 3.  This distorts the facts.  Plaintiff's anticipation of future benefits arises not from the say-so of some Human Resources specialist, but by operation of federal law.  Put simply: plaintiff's expectation is borne of statute, not

9

estoppel. He has, as such, a protected "security interest" in his FERS benefits that cannot be extinguished without due process of law. *See Roth*, 408 U.S. at 576.

The question, then, is what process plaintiff was due before OPM terminated his benefits. The answer is abundantly clear—where the government seeks to terminate an individual's property interest, it must provide advance notice that is "reasonably certain to inform those affected"[7] and "some kind of hearing." *Propert v. District of Columbia*, 948 F.2d 1327, 1331-32 (D.C. Cir. 1991) (citations and internal quotation marks omitted). Under no circumstance can the amount of process due "be reduced to zero." *Id.* at 1332. And yet, that is precisely what OPM appears to advocate.

Plaintiff contends that notice of the eighty percent limitation was inadequate. OPM, in its defense, argues that publication of the governing statute furnished all the notice plaintiff was due. *See* Def.'s Suppl. Mem. at 5-7. Not so. While it is true that statutory publication may satisfy the notice requirement in certain circumstances, *see Lightfoot v. District of Columbia*, 01cv1484 (CKK), 2007 WL 148777, at *8 (D.D.C. Jan. 16, 2007), our jurisprudence has long eschewed a one-size-fits-all approach to due process, *see Propert*, 948 F.2d at 1332 ("[T]he contours of due process are flexible and vary depending on the circumstances of a given case."). Here, atmospheric knowledge of the eighty percent limitation is simply inadequate for a blind veteran who would have had

---

[7] OPM's assertion that its regulation "imposes no notice requirement . . . that it notify annuitants of the statutory cap on income," *see* Def.'s Suppl. Mem. at 5, is of no moment. The issue is not what the *regulation says*; it is what the *Constitution requires*.

10

no cause to examine the statute before losing his sight and, lacked, moreover, the capacity to do so after his accident.

OPM's claim that plaintiff received actual notice of the eighty percent limitation is likewise unavailing. *See* Def.'s Suppl. Mem. at 7-10. OPM states that when it approved plaintiff's FERS disability benefits in April 2011, the agency mailed an approval letter, containing notice of the eighty percent limitation, to a P.O. Box in Ohio. *See* Wilhelm Decl. ¶¶ 5, 7; Lee Decl. ¶ 5; Minney Decl. ¶ 37. OPM—invoking the usual presumption that a letter properly addressed, stamped, and mailed is delivered to its intended recipient—argues that its notice obligation was satisfied. *See* Def.'s Suppl. Mem. at 9. What OPM overlooks, however, is that this presumption disappears when its opponent offers some evidence to the contrary. *Legille v. Dann*, 544 F.2d 1, 5-6 (D.C. Cir. 1976). Plaintiff here, indeed, offers such evidence. Plaintiff avers that because his P.O. Box closed in 2006, he never received the April 2011 mailing from OPM. *See* Minney Decl. ¶ 37. Plaintiff's 2010 FERS application lends credence to this assertion. As the Court pointed out at the August 4, 2015 hearing, plaintiff's application, which a VA representative submitted on his behalf before OPM approved plaintiff for FERS benefits, provides an altogether different mailing address for Mr. Minney than that to which OPM sent notice of plaintiff's approval in April 2011. *See* Def.'s Suppl. Mem. Ex. 2 at 1 [Dkt. #20-2]. These facts, taken together, cast more than a scintilla of doubt on defendant's supposition that plaintiff received the April 2011 mailing.

Undeterred, OPM argues that even if the April 2011 notice was sent to the incorrect address, subsequent notices of the eighty percent limitation *were* sent to plaintiff's correct address in 2011, 2013, and 2014. *See* Wilhelm Decl. ¶¶ 7-8; Wilhelm Decl. Ex. 2 [Dkt. #20-1]. This argument, too, is beset by faulty logic. What OPM fails to account for is the fact that each notice was sent in a *print* form that plaintiff is physically unable to read. The first notice plaintiff received, and understood, was in February 2015, at which point his 2014 income had irreversibly violated the eighty percent limitation. *See* Minney Decl. ¶ 42. Notice of this kind to a person who is legally blind is hardly notice at all. To meet the threshold for constitutional acceptability, notice must be "reasonably certain to inform those affected" *before* the right is terminated. *See Mullane v. Central Hanover Bank and Trust Co.*, 339 U.S. 306, 315 (1950). The notice here accomplished neither objective. I fail to see how *print* letters—each of which was addressed to a man with a documented visual impairment—were reasonably certain to furnish any information whatsoever. They provided nothing of the sort. For this reason, courts in analogous contexts have required that correspondence from government agencies to visually impaired disability recipients be offered in a decipherable alternative. *See Am. Counsel of Blind v. Astrue*, 05-04696 WHA, 2009 WL 3400686, at *27-28 (N.D. Cal. Oct. 20, 2009). Such a requirement is eminently logical where, as here, the burden

on the Government is minimal,[8] and is, in any event, far outweighed by the considerable private interests at stake.

The inquiry does not end there. Plaintiff was also entitled to a meaningful hearing *before* OPM terminated his benefits. *See Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 433 (1982) ("[I]t has become a truism that '*some* form of hearing' is required before the owner is finally deprived of a protected property interest.") (citation omitted) (emphasis in original)). A meaningful hearing is one in which a plaintiff is given the opportunity to "present reasons, either in person or in writing, why proposed action should not be taken." *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 546 (1985); *see Matthews*, 424 U.S. at 333 (the pre-termination hearing must be provided in a "meaningful manner" (citation and internal quotation marks omitted)). Plaintiff did not receive this either.

On May 27, 2015, after learning that OPM intended to terminate his FERS benefits, plaintiff filed a Request for Reconsideration. Minney Decl. ¶ 51. Amazingly, the Associate Director of Retirement Services at OPM informed plaintiff, *before* even considering his request, that it would be denied. Minney Decl. ¶ 52. OPM surely cannot suggest that this was the sort of hearing the case law contemplates. Plaintiff was *entitled* to a meaningful opportunity to advocate his position. What he *received* was a pre-determined outcome. Due process demands more than the rubber stamp treatment of bureaucrats run amok! One can only imagine what the reaction would be of the President

---

[8] By OPM's own admission, there are a mere 133 visually impaired individuals approved for disability

whose profile adorns the Purple Heart Medal[9] if a Court were to side with OPM and allow such "process" to trump the property interests of a severely wounded war veteran![10] Accordingly, for the reasons discussed above, the Court finds that the first factor easily militates in plaintiff's favor.

## II. Irreparable harm

The Court proceeds to the second prong of the inquiry—the likelihood that plaintiff will suffer irreparable harm if preliminary relief is not granted—and concludes that this factor likewise weighs in plaintiff's favor. To meet the threshold for irreparable injury, the injury must be "both certain and great" and, in all events, beyond remuneration. *Wisc. Gas Co. v. Fed. Energy Regulatory Comm'n*, 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam); *Sampson v. Murray*, 415 U.S. 61, 83-84 (1974) ("Mere injuries, however substantial, in terms of money, time and energy . . . are not enough" to meet the threshold of irreparable harm).

---

retirement. *See* Wilhelm Decl. ¶ 4.

[9] That President is none other than George Washington himself, who devised the original award, the Badge of Military Merit, in 1782 to reward "virtuous ambition in his soldiers, as well as to foster and encourage every species of Military merit." U.S. Dep't of Veterans Affairs, *Celebrating America's Freedoms*, available at http://www.va.gov/opa/publications/celebrate/purple-heart.pdf. In 1932, on the 200th anniversary of George Washington's birth, the Badge of Military Merit was reconstituted as the Purple Heart Medal that is awarded to this day to those who are wounded or killed in any action against an enemy of the United States. *Id.* True to its heritage, the Purple Heart Medal continues to be an enduring symbol of valor, patriotism, and sacrifice.

[10] Nor will this Court countenance OPM's apparent argument that plaintiff cannot succeed on the merits of his due process claim because 5 U.S.C. § 8455(a) prevents OPM from reinstating his benefits. *See* Def.'s Mot. at 11. OPM cannot credibly suggest that the statute sanctions violations of Fifth Amendment due process. No statute relieves agencies of their duty to administer the law in accordance with the Constitution. *Cf. Daniel v. Office of Pers. Mgmt.*, 245 F. App'x 969, 971 (Fed. Cir. 2007) (noting that the Court has power to reverse a decision by OPM regarding retirement benefits when that decision is "not in accordance with law," or "obtained without procedures required by law, rule, or regulation").

The harm at issue here is irreparable in the truest sense.  Plaintiff relied on his

FERS benefits for emergency medical coverage for which he is otherwise uninsured.[11]

*See* Minney Decl. ¶ 48.  This loss of coverage is especially devastating to a blind veteran

who is "prone to suffering serious injuries from falls because of [his] visual impairment.

*See* Minney Decl. ¶ 48.  Plaintiff's FERS benefits also provided health care coverage for

his two daughters, one of whom depends on it for the psychological counseling not

otherwise covered by her student insurance plan.  *See* Minney Decl. ¶ 47.  The lapse of

medical coverage caused by OPM's failure to provide adequate advance notice is

devastating for a man who is arguably more susceptible than sighted individuals to

grievous physical injury.  This Court is not alone in finding that a loss of this magnitude

meets the litmus test for irreparable injury.  *See, e.g., Risteen v. Youth for Understanding,*

*Inc.*, 245 F. Supp. 2d 1, 16 (D.D.C. 2002) (finding an irreparable injury where a loss of

health coverage caused plaintiff to lose access to medical treatment); *Wilson v. Grp.*

*Hosp. & Med. Servs., Inc.*, 791 F. Supp. 309, 313-14 (D.D.C. 1992) (finding irreparable

injury where a patient was threatened with loss of medical coverage).  Accordingly, I find

that this factor likewise weighs in plaintiff's favor.

---

[11] OPM attempts to diminish this harm by arguing that plaintiff "receives a Navy pension" and "qualifies for health coverage from the VA."  *See* Def.'s Suppl. Mem. at 13.  Neither of these options, however, provides *emergency* health coverage.  *See* Minney Decl.¶ 48.

15

### III.      Balance of the Equities

The Court next turns to the third factor of the preliminary injunction analysis, under which it must "balance the competing claims of injuries" and consider the "effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24. Plaintiff contends that the "equities cry out for relief" because defendant "seeks to penalize" a wounded veteran by "imperiling his own health and that of his daughters." *See* Pl.'s Mem. at 14. I agree. OPM's argument that it would be unjust to grant plaintiff an injunction because it lacks discretion to reinstate plaintiff's FERS benefits at the present time is weak, at best. *See* Def.'s Mot. at 17. The balance of the equities undoubtedly favor the wounded veteran here. Indeed, the Court does not believe OPM will suffer *any* injury from reinstating the benefits Corpsman Minney was entitled to receive in the first instance—and would likely still be receiving had OPM given plaintiff the process he was Constitutionally due. An injunction in this instance would neither commandeer extraordinary resources, nor impose an outlandish burden. It would merely restore the status quo. For that reason, the Court finds that this factor weighs, once again, in plaintiff's favor.

### IV.      Public Interest

All that remains is the fourth and final prong of the inquiry: whether the public interest would be served by the issuance of an injunction. *See Winter*, 55 U.S. at 24. It most assuredly would. Plaintiff argues that the public interest "strongly favors the care

16

and treatment of wounded veterans," especially where, as here, that treatment is interrupted by the Government's failure to provide adequate notice of the eighty percent limitation. *See* Pl.'s Mem. at 14. OPM, in response, retreats to its familiar argument that it "is prohibited from granting others who exceed the 80% limitation" the relief sought here. *See* Def,'s Mot. at 17-18. Unfortunately for OPM, its recitation fares no better under this prong of the analysis.

The public interest is, of course, best served when government agencies act lawfully. But the inverse is also true: the public interest is harmed when the Government ham-handedly exercises its responsibilities. It confounds all logic for OPM to argue—as it appears to do—that adherence to the eighty percent limitation absolves it of the duty to comply with Constitutional due process. It does not. Applying the law in a way that violates the Constitution is *never* in the public's interest and the Court fails to see how this case is any exception. As our Circuit Court itself noted: "The Constitution does not permit [the Government] to prioritize any policy goal over the Due Process Clause." *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013). Accordingly, I find that the public interest is vindicated by restoring the FERS benefits from which plaintiff appears, upon preliminary review of the facts, to have been divested without adequate process of law.

17

## CONCLUSION

Thus, for all of the foregoing reasons, the Court DENIES OPM's Motion to Dismiss for Lack of Jurisdiction, DENIES plaintiff's Motion to Strike Defendant's Supplemental Memorandum, GRANTS plaintiff's Motion for a Preliminary Injunction, and ORDERS that OPM REINSTATE plaintiff's disability benefits under the Federal Employee Retirement System. Once plaintiff's benefits are reinstated, OPM is ENJOINED from terminating those benefits until such time as OPM makes a finding as to plaintiff's eligibility for reinstatement upon his reapplication in January 2016, or until otherwise directed by Order of this Court. An Order consistent with this decision accompanies this Memorandum Opinion.

RICHARD J. LEON
United States District Judge

18